UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

In re:
    Joseph W. Gleason and Elaine L. Gleason
    a/k/a Elaine L. Whitten,

              Debtor.

Case No. 15-31254
Chapter 7

---

Joseph W. Gleason,
               Plaintiff,
  v.

U.S. Department of Education and Educational
Credit Management Corporation,
               Defendants.

Adv. Proc. No. 16-50007

---

| Appearances: | On behalf of: |
|---|---|
| Thomas F. Turturo, Esq.<br>228 Genesee Street<br>Auburn, New York 13021 | Plaintiff |
| William F. Larkin, Assistant U.S. Attorney<br>P.O. Box 7198<br>100 S. Clinton St.<br>Syracuse, NY 13261-7198 | U.S. Department of Education |
| William S. Nolan, Esq.<br>Whiteman Osterman & Hanna LLP<br>One Commercial Plaza<br>Albany, NY 12260 | Educational Credit Management Corporation |

## MEMORANDUM-DECISION AND ORDER

      Joseph W. Gleason ("Plaintiff" or "Debtor") brought this adversary proceeding seeking a declaration that student loan obligations owed to Defendants U.S. Department of Education ("U.S. Dept. Educ.") and Educational Credit Management Corporation ("ECMC") are

dischargeable as imposing an undue hardship upon the Debtor pursuant to 11 U.S.C. § 523(a)(8). Both U.S. Dept. Educ. and ECMC ("Defendants") answered the complaint, generally denying that Debtor meets the Second Circuit standard for finding undue hardship to warrant discharge of his student loan obligations ("Student Loans") (Docs. 5 and 6). This memorandum-decision and order incorporates the court's findings of fact and conclusions of law as permitted by Fed. R. Bank. P. 7052. For the reasons that follow, the court finds the Debtor's Student Loans non-dischargeable and shall dismiss the complaint as to both U.S. Dept. Educ. and ECMC.

*Jurisdiction*

The court has jurisdiction to hear and enter a final judgment in this adversary proceeding pursuant to the provisions of 28 U.S.C. § 1334(b) and § 157 (b)(2)(I).

*Background Facts*

The following facts are undisputed and gleaned from the record of these proceedings.[1] Plaintiff and his wife Elaine Gleason filed a joint petition for chapter 7 bankruptcy relief on August 24, 2015.[2] They are both 66 years old and have two adult children—a daughter and a son. Plaintiff incurred the Student Loans owed Defendants to finance the education of his son. Plaintiff retired three years ago, having previously worked for 34 years. Mrs. Gleason is unemployed. Debtors own their residence, appraised at $52,000 in February 2015. (Pl.'s Ex. 1). There is an outstanding mortgage balance of approximately $18,000 that, assuming ongoing

---

[1] The record consists of (i) the oral testimony of Debtor, who was the only witness to testify at trial; (ii) a Joint Stipulation of Facts signed by Debtor and U.S. Dept. Educ. and ECMC, respectively at Docs. 28 and 29 ("Joint Stipulation"); (iii) Joint Exhibits A through BB and (iv) Plaintiff's Exhibit 1.
[2] Plaintiff and Mrs. Gleason are jointly referred to as "Debtors."

2

monthly payments, will be paid in full by October 2022.[3] Notwithstanding the value reflected by the appraisal, the property is assessed at $72,000 for tax purposes. Debtors have not sought to reduce that assessment.

*Assets and Liabilities*

In addition to their residence, Debtors listed as assets a (i) 2005 Cherokee 28′ travel trailer valued at $5,000 ("Camper"), (ii) 2001 Dodge Dakota valued at $1,600, (iii) 2008 Jeep Cherokee valued at $9,800, (iv) 2009 EZ-Go golf cart valued at $2,500 and (v) 1991 Glastron 16′ motor boat valued at $2,200. Debtors also listed a checking account with a zero balance at First Niagara Bank with a zero balance. All of the foregoing property was claimed as exempt by Debtors pursuant to 11 U.S.C. § 522(b)(2).

*Investment Accounts*

Although not disclosed on Debtors' Schedule of Assets, Debtor testified that he has an interest in a (i) 401(k) account ("401(k)"), (ii) Fidelity roll-over IRA ("IRA") (together referred to as "Investment Accounts") and (iii) MetLife retirement annuity ("Annuity"). The value of the Investment Accounts and Annuity on the petition date is unknown, but as of November 2012—when the student loan repayment period commenced—the 401(k) was valued at $209,108.44. That same month, Debtor withdrew $137,150.69, which he rolled into the newly created IRA, leaving a balance in the 401(k) of $71,957.75. In December 2013—with funds from the IRA—Debtor purchased the Annuity for $100,000.[4] As of December 31, 2016, the value of the

---

[3] The $556.79 monthly mortgage payment covers principal, interest, taxes and insurance.
[4] Mrs. Gleason is a joint annuitant. Debtors failed to disclose this interest on their schedules.

Annuity was $98,720.99. Debtor has not claimed the Annuity or Investment Accounts as exempt.

The table below illustrates the individual and total values of the Annuity and Investment Accounts from late 2012 to December 31, 2016—a period of time during which Debtor was obligated to pay his Student Loans, but made no payments.

|  | 401(k) Balance | IRA Balance | Annuity Balance | Total |
|---|---|---|---|---|
| November 13, 2012 beginning balance | $ 209,108.44 |  |  | *$ 209,108.44* |
| November 13, 2012 ending balance | $ 71,957.75 | $ 137,150.69 |  | *$ 209,108.44* |
| December 20, 2013 | – | – | $ 100,000.00 | – |
| December 31, 2013 | – | $ 45,362.18 | – | – |
| March 31, 2015 | – | $ 18,959.45 | – | – |
| June 30, 2015 | $ 130,959.42 | – | $ 104,708.04 | – |
| December 31, 2016 | $ 137,352.62 | $ 11,217.75 | $ 98,720.99 | *$ 247,291.36* |
| *Note: a notation of – indicates that information is not available in the record.* | | | | |

In September 2011, Mrs. Gleason had a money market account valued at $98,925.96 ("Money Market Account"). Mrs. Gleason withdrew $32,255 from the Money Market Account and deposited it into the Debtors' joint checking account ("Joint Account"). Three months later, Mrs. Gleason purchased the aforementioned Camper for approximately $7,250, which is titled jointly in the Debtors. In December 2012, Mrs. Gleason withdrew $28,882.19 from the Money Market Account and bought the 2008 Jeep, which is also jointly titled. The record does not reflect the disposition of the remaining $30,000, but as of August 2013, the Money Market Account had a zero balance.

4

*Joint Checking Account*

The following table summarizes select checks written by Debtor, which were drawn on the Debtors' Joint Account during the period May 8, 2012 – October 20, 2016.[5] Repeat expenses include lot rent, utilities, and other charges accrued at the campground at which the Debtors use the Camper ("Riverforest").

| Date | Payee | Amount | Purpose |
|---|---|---|---|
| *May 8, 2012 | Cayuga County Clerk | $ 442.23 | Taxes due-Camper purchase |
| *June 9, 2012 | Riverforest | $ 700.00 | 2012 lot rental |
| *June 9, 2012 | Riverforest | $ 70.00 | Gray water insulation |
| *June 29, 2012 | n/a | $ 4,800.00 | Automobile for Adult Daughter |
| December 26, 2012 | Riverforest | $ 1,270.00 | 2013 lot rental |
| May 24, 2013 | Michael Hatchwell | $ 500.00 | Golf cart purchase |
| June 15, 2013 | Michael Hartwell | $ 400.00 | Golf cart batteries |
| December 2, 2013 | Riverforest | $ 1,711.68 | 2014 lot rental and utilities |
| March 2, 2014 | Heritage Motors | $ 5,073.25 | Golf cart purchase |
| March 2, 2014 | Heritage Motors | $ 1,000.00 | |
| August 3, 2014 | n/a | $ 500.00 | Automobile for Adult Son (down payment and purchase) |
| August 6, 2014 | Cash | $ 4,500.00 | |
| January 21, 2015 | Turturo Law Firm | $ 2,500.00 | Bankruptcy related legal fees |
| October 20, 2016 | Thomas F. Turturo | $ 1,500.00 | Bankruptcy related legal fees |
| **Total** | | **$ 24,967.16** | |

*Debt*

Debtor's Schedule F—Creditors Holding Unsecured Non-Priority Claims—reflects debt of $141,614, of which $13,526 is attributable to credit cards and the balance, $128,088, is attributable to the Student Loans. Debtor testified that his wife had previously paid his credit

---

[5]These first four checks (marked by an asterisk) were written prior to the November 2012 commencement of the repayment period.

5

card debt in full more than once, and that his Student Loans were the primary reason for his bankruptcy.

*Student Loan History*

Of the $141,614 of unsecured debt listed by the Debtors, 90% is attributable to the Student Loans incurred by Plaintiff to pay for his son's college education. The Student Loans came due in November 2012, six months after Plaintiff's son graduated from college. Plaintiff has made no payments to either Defendant on the Student Loans.

ECMC advised Plaintiff of the availability of the William D. Ford Federal Direct Loan Program ("Ford Loan Program"), which would provide him the option to make reduced monthly payments through an Income Contingent Repayment Plan ("Repayment Plan"). A Repayment Plan would allow Debtor to consolidate his Student Loans and cap his monthly payment at 20% of his monthly discretionary income,[6] with the proviso that any unpaid balance remaining after 25 years of payments would be forgiven. Debtor has declined to pursue this or an alternative repayment program offered by Defendants pending resolution of this adversary proceeding.

*Income during the Repayment Period*

In 2012, Debtors' adjusted gross income ("AGI") was $38,853. The following year, Debtors' AGI was $59,648, due to an increase of $22,000 from an IRA distribution. In 2014, Debtors' AGI was $53,322, of which amount $14,500 represented an IRA distribution. In 2015, Debtors' AGI was $19,267, $16,050 of which was an IRA distribution.[7]

---

[6] Under the Income Contingent Repayment Plan, monthly discretionary income equals Debtor's adjusted gross income minus the poverty level (as established by the U.S. Department of Health and Human Services) for his state of residence and family size, divided by twelve.

[7] Debtors filed for bankruptcy on August 24, 2015. There was no explanation satisfactory to the court as to why

6

Beginning in 2016, Debtor began receiving monthly annuity income of $431.72 and monthly Social Security payments of $1,460.20. Combined with his wife's Social Security payments of $653.20 per month, Debtors' monthly household income totals $2,545.12.

*Expenses*

Debtors' fixed monthly expenses are at least $3,044,[8] and the monthly shortfall between their income and expenses is approximately $499. Their monthly expenses include approximately $265 for maintaining the Camper and campsite rental and a $556.79 mortgage payment, which includes an escrow for real property taxes. Debtor testified that he withdraws money from one of his Investment Accounts to meet his expenses when his income falls short.

*Legal Standard for Finding "Undue Hardship"*

Student loans are presumptively nondischargeable under 11 U.S.C. § 523(a)(8) unless "excepting such debt from discharge…would impose an undue hardship on the debtor and the debtor's dependents." The debtor bears the burden of proving by a preponderance of the evidence such undue hardship. *See Grogan v. Garner*, 498 U.S. 279, 291 (1991).

In 1987, the Second Circuit enunciated the standard for finding "undue hardship" to support the discharge of a student loan in its seminal decision in *Brunner v. New York State Higher Educ. Serv. Corp.*, 831 F.2d 395, 396 (2d Cir. 1987). The *Brunner* court found that a debtor must prove the following three prongs:

> (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans;

---

Debtors' earned income suddenly dropped off in the year they chose to file.

[8] This figure represents the court's recalculation of the expenses itemized by the Debtor in his response to U.S. Dep't. of Educ. First Set of Interrogatories ¶ 23. See Ex. T.

7

(2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and
(3) that the debtor has made good faith efforts to repay the loans.

*Id.* If a debtor fails to establish any one of the three prongs, the court need not continue with its inquiry. *Brunner, 831 F.2d at 396.* The *Brunner* standard has been the law of this Circuit for more than 25 years and is controlling precedent in assessing whether Debtor has demonstrated undue hardship.

*Discussion*

*First Prong: Can Debtor maintain, based on current income and expenses, a "minimal" standard of living if forced to repay the loans?*

This first prong requires Debtor to prove that based upon his current income and expenses, he cannot maintain a minimal standard of living for himself and his dependents if forced to repay the Student Loans. *See Id* at 396. Debtor must demonstrate that "not only has [he] minimized the family's living expenses, but also maximized their personal and professional resources." *In re Kenny*, 313 B.R. 100, 107 (Bankr. N.D.N.Y. 2004). Well-established case law makes clear that the court must consider "[t]otal household income ... in conducting this minimal standard of living analysis, as well as its relevance in generally determining undue hardship under the Bankruptcy Code." *In re Davis*, 373 B.R. 241, 248 (W.D.N.Y. 2007) (collecting cases).

Debtor testified that Debtors' current monthly household income is $2,545.12 and approximate monthly household expenses are $3,044. Without accounting for any payment toward the Student Loans, there is a budget shortfall each month of approximately $499. Debtor testified that he covers the monthly shortfall with periodic withdrawals from one of his

8

Investment Accounts. Debtor argues that his income for several years has been insufficient to meet his regular monthly expenses and that because he is already drawing against his Investment Accounts to make ends meet, there is no income available to pay his Student Loans.

Defendants argue that while Debtor's income is "modest" by many standards, it is far from minimal and provides him with the ability to afford discretionary and leisure expenses such as the Camper and assisting his adult children with their expenses. Defendants argue that Debtor could avail himself of the Ford Loan Program or an alternative repayment program, which would allow him to maintain a minimal standard of living while making payments toward the Student Loans. Defendants further argue that it would not be unconscionable to require Debtor to reduce expenses or earn more income.

The court finds that Debtor does not live an extravagant lifestyle. Debtors live modestly and yet are unable to meet monthly expenses without periodically withdrawing from Debtor's Investment Accounts. The Camper-related expenses hardly seem lavish, but were the court to reject consideration of these expenses, the Debtor would still run a $234 deficit each month. Arguably, that shortfall could be further offset were Debtor to grieve his tax assessment and reduce his mortgage payment. Debtor would still have no disposable income, however, to pay down his Student Loans.[9] The court finds that Debtor has met his burden of proving that he cannot maintain, *based on current income and expenses*, a "minimal" standard of living for himself and his dependents if forced to repay the Student Loans.

---

[9] The current shortfall of $499 less camping expenses of $265 still equals a $234 shortfall. The reduction in the monthly mortgage payment following a successful tax assessment grievance would have to exceed $234 before there would be any excess income available to pay the Student Loans. In taking judicial notice of the equalization rate in Cayuga County, the county in which Debtors reside, a successful challenge reducing the current assessment by $20,000 would yield approximately $800 per year or $67 per month in savings.

*Second Prong: Do additional circumstances exist to indicate that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans?*

This second prong of the *Brunner* test is forward-looking and requires that Debtor prove not only that he is presently unable to pay his Student Loans, but that his "current financial hardship is likely to be long-term." *In re Wells*, 380 B.R. 652, 600 (Bankr. N.D.N.Y. 2007). Debtor must prove that there exist "additional, exceptional circumstances, strongly suggestive of continuing inability to repay over an extended period of time" in order to guarantee that the hardship presented is undue. *Brunner*, 831 F.2d at 396. The second prong evinces "the clear congressional intent exhibited in section 523(a)(8) to make the discharge of student loans more difficult than that of other nonexcepted debt." *Id.*

It appears from Defendants' Exhibits A and B that the original repayment period for the Student Loans is ten years and commenced in November 2012. Alternatively, the Ford Loan Program's Income Contingent Repayment Plan offers a 25-year repayment term.[10]

Much of the case law addressing this second prong focuses on a debtor's ability to earn income during the repayment period that is sufficient to repay student loan obligations. *See, e.g., In re L.K.*, 351 B.R. 45 (Bankr. E.D.N.Y. 2006) *as amended* July 6, 2009; *In re Wells*, 380 B.R. 652 (Bankr. N.D.N.Y. 2007); *In re Sorber*, 358 B.R. 68 (Bankr. N.D.N.Y. 2006). In this regard, the court recognizes that the Debtors are both 66 years old, that he is retired, and that she is unemployed. Debtor further testified, albeit without a medical expert's supporting opinion, to physical disabilities that constrain him from working and earning more income.

Should the court consider Debtor's hardship against a 25-year repayment term, the scale would tip not because of the plausible lack of future earnings potential, but rather because there

---

[10] https://ifap.ed.gov/dlbulletins/attachments/DLB0815AttachDSubUnsubMPNBRR.pdf at p. 3.

exists the certainty of a reduction in Debtor's expenses. In five years, Debtors' mortgage will be satisfied and the portion of the mortgage payment attributable to principal and interest will be available to pay other debt. Additionally, Debtors are capable of reducing their real property tax assessment. These measures would not only reduce their monthly deficit, but would result in surplus funds that Debtor could apply to the Student Loans.

However, should the court consider Debtor's hardship against a ten-year repayment period, these reductions in expenses will occur too late. Neither party has sufficiently established which repayment period is applicable to the court's analysis. The court will proceed to analyze the third prong of the *Brunner* test, which, in this case, is determinative.

*Prong Three: Has the Debtor made good faith efforts to repay the loans?*

The third prong of the *Brunner* test requires that Plaintiff prove that he has made good faith efforts to repay the Student Loans. Courts may consider the ratio of a debtor's student loan debt to total debt to be discharged when evaluating good faith. *In re L.K.* 351 B.R. 45, 55 (Bankr. E.D.N.Y. 2006). Here, Plaintiff's Student Loans account for 90% of the debt he seeks to discharge and Debtor readily admits that his primary purpose for filing is to discharge the Student Loans. These circumstances weigh against finding good faith.

What is most telling, however, is that Debtor has made no payments on the Student Loans. At the same time, Debtor has made discretionary expenditures, involving golf carts and camping and gifted his adult children with automobiles. Debtor's ongoing expenditures reveal a disregard for the prioritization of his Student Loans over his leisure activities and personal preferences, which is in direct contravention to what this court views as a good faith effort to repay his Student Loans.

By way of explanation, the Debtor testified that he expected his son to repay the Student Loans. However, the Debtor signed the loans and committed to their repayment and his separate understanding with his son is irrelevant to a determination of his good faith.

Lastly, Debtor fails to account for the impact that the IRA and 401(k) have on the assets available to repay the Student Loans. Debtor did not claim the Investment Accounts as exempt. However, even if he had, "[t]he exempt character of an asset does not necessarily preempt its relevance to a hardship evaluation." *In re Armesto*, 298 B.R. 45, 48 (Bankr. W.D.N.Y. 2003). As explained in *Armesto*, "[e]ven though New York's exemption law might preclude the recovery of [a] judgment from an exempt asset, the debtor's access to that exempt asset may nonetheless allow payment without any undue hardship to the debtor." *Id.* The *Armesto* court recognized that "[t]his possibility, however, depends upon the unique circumstance of each debtor" and that "[f]or some debtors, the forfeiture of an exempt asset may exacerbate a situation of undue hardship." *Id.* In such case, the availability of "an exempt asset will not preclude the discharge of an educational loan." *Id.*

In *Armesto*, the debtor lived on a net income of about $500 per month, drove a 17 year-old automobile, and because she did not have insurance, was forced to forego treatment for her agoraphobia. The *Armesto* court found that even upon receipt of an exempt $7,500 tort recovery, the debtor "lack[ed] sufficient resources and income to pay her student loans without undue hardship." *Armesto*, 298 B.R. at 49. The *Armesto* court did not require the debtor to forfeit the exempt tort recovery.

In this case, however, the circumstances are very different from those in *Armesto*. Debtor has sufficient resources and income, and the ability to reduce his expenses. Combined, this enables Debtor to make some payment toward the Student Loans. This is especially true given

the availability of the Income Contingent Repayment Plan and alternative repayment arrangements previously offered by both Defendants.

For all of the foregoing reasons, the court is unable to find that Debtor has made a good faith effort to repay his Student Loans. Even had Debtor successfully satisfied prongs one and two of the *Brunner* test, the court finds that Debtor did not carry his burden of proof with respect to the third prong of the *Brunner* test.

*Conclusion*

Debtor has failed to establish by a preponderance of the evidence that he meets the Second Circuit's three-prong *Brunner* test to find that repayment of his Student Loans would impose an undue hardship. Accordingly, a separate judgment shall issue dismissing the complaint.

Dated: October 6, 2017
       Syracuse, New York

                                    Margaret Cangilos-Ruiz
                                    United States Bankruptcy Judge